**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ALEXIS DOCTOR** | : | |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **C.A. 05-424 ML** |
| | : | |
| **ADULT CORRECTIONAL** | : | |
| **INSTITUTION** | : | |
| **Respondent** | : | |

## STATE OF RHODE ISLAND'S MOTION TO DISMISS

Now comes the State of Rhode Island, by and through its attorneys, and, for the reasons expressed in the accompanying supporting memorandum, respectfully moves to dismiss plaintiff's "Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a person in State Custody."

Respectfully submitted,

**STATE OF RHODE ISLAND**
By Its Attorneys,

**PATRICK C. LYNCH**
**ATTORNEY GENERAL**

**AARON L. WEISMAN, #4438**
Assistant Attorney General
Department of Attorney General
150 South Main Street
Providence, RI 02903

## CERTIFICATION

I hereby certify that on the 1st day of November 2005, I placed a copy of the within document in the U.S. mail, postage prepaid, to Alexis Doctor, pro-se, at his last known address of PO Box 8272, Cranston, Rhode Island, 02920.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **ALEXIS DOCTOR** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | **CA 05-424ML** |
| | : | |
| **ADULT CORRECTIONAL INSTITUTION** | : | |
| | : | |

**STATE OF RHODE ISLAND'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S "PETITION UNDER 28 U.S.C. §2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY"**

The relevant background of the instant case was recently set forth by the Rhode Island Supreme Court in Doctor v. State, 865 A.2d 1064 (R.I. 2005):

> This case arises from a shooting that occurred on August 11, 1990, in front of Sonny and Dennis' nightclub, located on the corner of Eddy and Globe Streets in Providence. That night, a vehicle containing six passengers was stopped in traffic in front of the club, when three individuals carrying guns approached and proceeded to open fire on the car and its occupants. After the gunmen ceased shooting and ran back to the rear of the club, the driver of the bullet-riddled vehicle somehow managed to drive to nearby Rhode Island Hospital. Willie Davis, one of the passengers, was thereafter pronounced dead due to a fatal gunshot wound to the head. Another passenger was treated for a bullet wound in his shoulder.
>
> Witnesses identified Alexis Doctor, his brother Jose Doctor, and an unnamed juvenile as the three gunmen. [Footnote omitted.] The state subsequently charged Alexis Doctor and his brother Jose with murder, conspiracy with an unindicted juvenile to commit murder, and two counts of assault with intent to commit murder. In February 1992, a first jury trial ended in a mistrial after the state's witness, Rodney Perry, invoked his Fifth Amendment privilege in front of the jury. In March 1992, a second jury trial resulted in the conviction of both brothers. We later overturned those convictions, however, holding that the trial justice had improperly restricted the scope of defense counsel's cross-examination of a witness. State v. Doctor, 644 A.2d 1287, 1291 (R.I.1994). In January 1995, a third

trial commenced and a jury again returned guilty verdicts on all counts against both Alexis and Jose. Each was sentenced to life imprisonment on the murder charge. On the conspiracy charges, each received a ten-year suspended sentence, with ten years probation. On the assault charges, each received a suspended sentence of five years to serve with five years probation. We affirmed the convictions in State v. Doctor, 690 A.2d 321 (R.I.1997).[[1]]

---

[1] In the *Facts and Travel* portion of that 1997, decision, the late Justice Bourcier, writing for the Court, set forth in some detail the facts of the crime of which Defendant was convicted, and the evidence presented by the State at Petitioner's (1995) trial:

> On August 11, 1990, John Norman (Norman), Rodney Perry (Perry), Kimani Morris (Morris), Ronald Nelson (Nelson), Mark Ellis (Ellis), and Willie Davis (Davis) went to Sonny and Dennis', a club on the corner of Eddy and Globe Streets in Providence. Nelson was driving the car, Ellis sat in the middle of the front seat, and Davis sat on the front passenger side. Morris sat in the back seat on the driver's side, Norman sat next to Morris, and Perry was on the passenger side in the rear of the car. After patronizing Sonny and Dennis' for about one hour, they went to the River Cafe in the Fox Point section of Providence. They never actually entered the River Cafe, after having tried unsuccessfully to avoid paying a cover charge in order to gain entrance, but instead socialized outside for about a half hour. They thereafter returned to Sonny and Dennis'. When they arrived there, traffic was heavy around the area of Sonny and Dennis', and as a result the car in which the six men were traveling was stopped in front of the club. Suddenly three men appeared from behind the club and approached the car. One of the men, later identified as the defendant Alexis Doctor, ran to the passenger side, another, later identified as Jose Doctor, went to the driver's side, and the third, a juvenile, went to the front of the car. All three were carrying guns. The three men began shooting at the six passengers in the car and continued shooting for about five minutes. The gunmen then ran back to the rear of the club. As a result of the shooting, Davis was fatally shot in the head, and Perry was shot in the shoulder. Nelson then drove the car to Rhode Island Hospital, where the two injured men were taken inside for treatment.
>
> On March 1, 1991, a Superior Court indictment was filed charging Jose and Alexis with four offenses: (1) the murder of Davis, (2) conspiracy with an unindicted juvenile to commit murder, (3) assault with intent to murder Nelson, and (4) assault with intent to murder Perry. [Footnote omitted.] Their jury trial commenced in February 1992, but, after a state witness invoked his Fifth Amendment privilege in front of the jury, a mistrial was declared. A

second jury trial commenced in March 1992. That trial resulted in convictions, but those convictions were reversed by this Court because the trial justice had improperly restricted the scope of defense counsel's cross-examination of a trial witness. State v. Doctor, 644 A.2d 1287 (R.I. 1994.)

A third trial, and the trial we are concerned with here, commenced in January 1995. At that trial Norman, testifying for the state, told the Court and jury that the area around Sonny and Dennis', where the shooting incident occurred, was well lighted by street lights and that he was able to see the gunmen as they approached the car. He testified that he recognized them as Jose and Alexis Doctor and Junior. He testified further that he knew Jose and Alexis for some three to four years and knew Junior for about one year. He remembered that the gunmen were wearing "hoodies," oversized hooded sweatshirts. He also testified at trial that just before the gunmen began shooting, he heard Alexis Doctor say, "[W]here is my brother, Shit, at?" He then estimated for the jury that the shooting went on for about five minutes and that the three gunmen then ran back to the rear of Sonny and Dennis'. Norman, at that time, noticed that Davis and Perry had been shot and accompanied the other occupants of the car when they brought Davis and Perry to Rhode Island Hospital. Norman did concede that he never actually saw Jose Doctor fire the weapon Jose was carrying at the time of the shooting.

When the police first questioned Norman about the incident, he denied having any relevant information about the shooting, but he later provided the police with his eyewitness account. That police statement was consistent with his testimony given at the March 1992 trial as well as his testimony given at the January 1995 trial at issue herein.

Another witness testifying for the state was Vicky Brown Strong (Strong), the sister of the mother of the decedent Davis. Davis's mother is a deaf-mute, and as a result Strong had a close relationship with her sister and often assisted her in communicating with other people. Strong and Davis's mother were able to communicate through sign language.

Strong testified that on August 11, 1990, a Saturday night, she had been socializing with some friends outside a house at 275 Rhodes Street. She testified that while socializing, she had drunk two wine coolers and had smoked marijuana but that notwithstanding she was still "very positive" about her recollection of the events that occurred on the night in question. She recalled that when she arrived at Rhodes Street at about 7 or 8 p.m., Alexis was already there. Soon thereafter Junior and Jose arrived at the social gathering independently of each other. She appeared slightly

confused in her testimony when questioned about the exact times of the arrival of Junior and Jose. However, she had no difficulty in recalling that when Junior arrived, he began talking to Alexis and then they showed each other their guns. She recalled also at one point that when Jose drove to the house on Rhodes Street, he was wearing a black, hooded sweater. She also recalled seeing him reach into the back seat of the car he was driving to obtain a gun. She testified that Jose, Alexis and Junior then left together in a car belonging to Junior. Strong testified further that, as the three men were leaving the gathering at Rhodes Street, she heard Alexis say to Jose and Junior, "[L]et's go do this."

Strong then testified that Jose and Alexis returned to Rhodes Street some forty-five minutes later, and that Junior was not with them. At that time she saw Jose and Alexis run out of and from Junior's car and run into Jose's car. She testified that Jose was running "like he was scared to death" and that Alexis, running with gun in hand, was "jumping up in the air hollering 'Yeah, Yeah'" and "Fuck that nigger, Fuck that nigger."

Strong found out later that night that her nephew, Davis, had been shot. She went to Rhode Island Hospital with her daughter and niece at about 1 or 1:30 a.m. She claimed that she tried to give a statement to the police at the hospital but that no one wanted to talk to her. She testified that, in fact, the police had harassed her and had pushed her away.

Strong did not testify at any of the two previous trials or at any preliminary hearings, perhaps, in part, because she had never given a statement concerning the events to the police. She testified that the reason she had never testified at any of the prior trials or hearings was because she was often out of town with her boyfriend, a truck driver, during the pendency of the earlier hearings and trials. However, she testified that at one point she did attend a Family Court hearing concerning Alexis. After being shown, on cross-examination, a report from the Department of Children, Youth and Families (DCYF) that confirmed that she had spoken to a DCYF officer in February or March 1992, at or about the time of the second trial, she acknowledged that she had also attended one or two Superior Court hearings, but that she had been asked to leave the courtroom. She was never called to testify as a witness, however, at any of those hearings.

Nelson was also called to testify for the state. He proved to be a highly uncooperative witness and testified that he did not know who the gunmen were. He explained to the jury that his prior statement to the Providence police, his prior statement given at a September 1990 bail hearing, and a prior statement he had given at Alexis's Family Court waiver hearing, all of which identified Jose

and Alexis as two of the gunmen, were all incorrect. He told the court and jury that "I could have told them [the police] anything. I am a convicted felon. I'm the corruptest person you ever wanted to meet. I will tell you anything."

As part of the state's case, Walter Williams (Detective Williams), a detective in the Bureau of Criminal Identification of the Providence police department, testified that in the early morning hours of August 12, 1990, he found three shell casings from a .45-caliber semiautomatic weapon around the vicinity of Sonny and Dennis'. He testified that he also found some 9-millimeter live ammunition on Eddy Street and on the corner of Eddy and Globe Streets. He further testified that after searching around Sonny and Dennis', he went to Rhode Island Hospital where he recovered a .38-caliber projectile. The next morning, he said that he retrieved two .45-caliber projectiles from the driver's door of the car in which the six men had been traveling on the night of the shooting. A .38-caliber projectile was found in Davis's body during his autopsy. Detective Williams conceded while testifying, however, that he could not be certain that all the casings that he found in the vicinity of Sonny and Dennis' came from the shooting incident in question, because the corner of Eddy and Globe Streets was and is, generally, a high crime area.

Richard Wilkinson, a ballistics expert and an employee of the State Crime Laboratory, also testified. He told the jury that the .38-caliber projectiles collected by Detective Williams were fired from the same gun and that the .45- caliber projectiles collected by Detective Williams were also fired from the same gun but not the gun from which the .38-caliber projectiles had been fired. He testified that it was not possible to fire a .38-caliber projectile from a .45-caliber weapon or vice versa.

The former Chief Medical Examiner's testimony, given by him at the first trial, was read into the record, by stipulation of the parties. That prior recorded testimony described the location and the type of injuries sustained by the decedent, Davis, and concluded that Davis's wounds were consistent with those from a bullet fired from a distance of at least three feet.

Testifying for the defense for the purpose of impeaching Strong's earlier testimony was Keith Tucker (Sergeant Tucker), a sergeant with the Providence police department assigned to Internal Affairs. Sergeant Tucker told the jury that the only complaint ever filed by Strong with the department was in an unrelated matter, and that he had no record of any complaint ever having been filed by Strong relating to the murder of Davis or the allegedly hostile treatment that she claimed she received from the police at the hospital when she went to see Davis.

Ellis, one of the passengers in the car in which Davis had been shot, was also called by the defense. He testified that he had drunk alcohol, smoked marijuana, and had taken mescaline at Sonny and Dennis' on the night of the shooting. He testified further that he did not see who shot at the car and that he did not see Jose or Alexis on the night in question. He described the gunmen who did the shooting as wearing "hoodies" that covered their faces. Ellis had never been called to testify in any of the previous trials and, in fact, had never given a written statement to the police, although he did say that he had been questioned by the police while at the hospital on the night Davis was shot.

The defendants, Jose and Alexis, both testified in their own defense. Jose testified that on the night in question, he had gone to Rhodes Street where Strong was socializing with her friends but that he left there some time around 8 or 9 p.m. to go to McDonald's. He told the jury that after he returned home after getting something to eat at McDonald's, he changed his clothes and then went to Sonny and Dennis' at about 10 or 10:30 p.m. He had a beer at Sonny and Dennis' and left there after a half hour to forty-five minutes. He told the jury that he then went home and went to bed at around 11:30 p.m. or midnight. He also testified, contrary to Strong's testimony, that Junior did not own a car, which, according to Strong, was the very vehicle in which all three alleged gunmen had driven away in from Rhodes Street. However, Jose corroborated Strong's testimony regarding his own car, a yellow Cutlass, thereby lending additional support to her testimony.

Alexis testified that he went to Rhodes Street at around 3 or 4 p.m. and left there at around 7 p.m. so that he could visit with friends on Laura Street in Providence. He further testified that he arrived home at around 10 p.m. Alexis noted that when he arrived home, he believed his brother, Jose, was already there. He conceded, however, that Jose's room, which was located in the basement of the house, had a separate entrance from the rest of the house so that Jose could enter and leave his room without having to go through the main part of the house.

At the conclusion of the defendant's trial, the jury returned guilty verdicts against the defendants on the murder and conspiracy charges and on the two counts of assault with a dangerous weapon. They thereafter moved for a new trial on the basis of newly discovered evidence. A hearing on those motions was held on February 14, 1995. At that hearing, Norman, the primary witness for the state at trial, recanted his trial testimony in which he had identified the defendants as the gunmen. He told the motion justice that he had been told by Morris, now deceased, that Alexis and Jose were the gunmen but that he did not actually see the gunmen

> On April 23, 1997, Alexis filed an application for postconviction relief in Superior Court. He later filed an amended application for postconviction relief on April 17, 2000, and the Superior Court held a hearing on September 29, 2003. At that hearing, the applicant claimed that he was entitled to postconviction relief on two grounds. First, he maintained that his attorney's deficient performance during his trial amounted to a violation of his right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. Second, applicant alleged that he had acquired new evidence that had been undiscoverable at the time of his original trial and that warranted a new trial. The hearing justice was not persuaded by his arguments, however, and denied Doctor's application for postconviction relief, entering judgment on March 18, 2004. The applicant filed a timely appeal to this Court. *** For the reasons stated herein, we affirm the judgment of the Superior Court.

(Doctor v. State, 865 A.2d at 1066, 1071.)

In the instant 28 U.S.C. § 2254 action, Petitioner advances four grounds, which may be set forth as: 1) that his constitutional right to cross-examination was violated at his trial by the trial justice having precluded petitioner's attorney from exploring a state witness's bias; 2) that his trial attorney was constitutionally ineffective by having "failed

---

> himself. Despite Norman's recantation, the trial justice denied the motions for new trial. The trial justice characterized Norman's recantation testimony as "totally and utterly fabrication." He further found that the defendants' testimony amounted to "foolish stories." The trial justice concluded, therefore, that Norman's testimony at the trial, when coupled with Strong's testimony and the unbelievable testimony given by the defendants, clearly warranted the jury's verdict. He consequently denied the defendants' motion for new trial.
>
> At their sentencing, each of the defendants was sentenced to life imprisonment on the murder charge, ten years to serve, but suspended, with ten years' probation on the conspiracy charge, and five years to serve, but suspended, with five years' probation on each of the two assault charges. The suspended sentences and probationary terms were imposed to run consecutive to the life sentences.

(State v. Doctor, 690 A.2d at 323-26.)

to investigate the discrepancy regarding conflicting testimony of the number of individuals in the victims vehicle and [having] failed to discover [that] Morris [one of the occupants of the fired-upon-vehicle] shot a gun"; 3) that there was error in the trial justice's custody instruction; and 4) that his trial attorney was constitutionally ineffective by having "fail[ed] to investigate and/or examine witness [sic]". (Petitioner's *Application[] For Habeas Corpus Under 28 U.S.C. Section 2254* at 6-7.)

Pursuant to Rule 5(d) of the *Rules Governing Section 2254 Cases in the United States District Courts*,[2] the State has moved to submit with this Court 1) the briefs filed by the parties in both the direct appeal of Petitioner's conviction and in the appeal of the Superior Court's denial of Petitioner's state postconviction relief application, and 2) the two (aforecited) Rhode Island Supreme Court decisions disposing of such two appeals (State v. Doctor, 690 A.2d 321 (R.I.1997), and Doctor v. State, 865 A.2d 1064 (R.I. 2005).) An examination of the two briefs filed by Petitioner in the Rhode Island Supreme Court, evidences his apparent failure to have raised (in habeas parlance, "exhausted")[3]

---

[2] That provision, in relevant part, directs "[t]he respondent [to] *** file with the answer a copy of (1) any brief that the petitioner submitted in an appellate court contesting the conviction or sentence, or contesting an adverse judgment or order in a post-conviction proceeding ; (2) any brief that the prosecution submitted in an appellate court relating to the conviction or sentence; and (3) the opinions and dispositive orders of the appellate court relating to the conviction or the sentence."

Further, pursuant to section (b) of that provision (Rule 5 of the *Rules Governing Section 2254 Cases in the United States District Courts*) the State informs this Honorable Court that, to the undersigned's knowledge and belief, the transcripts of the relevant trial and post-conviction relief proceedings are in the State of Rhode Island's Records Center, and could be made available for review if required by the Court in this 28 U.S.C. § 2254 action.

[3] *See* Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198 (1982)(prohibiting federal district courts from adjudicating mixed habeas corpus petitions, that is, petitions containing both exhausted and unexhausted claims).

before the Rhode Island Supreme Court his final contention in this 28 U.S.C. § 2254 action (that his trial attorney was constitutionally ineffective by having "fail[ed] to investigate and/or examine witness [sic]; there was testimony that could have been available for petitioner's 1995 trial, that the lawyer failed to investigate" (Petitioner's *Application[] For Habeas Corpus Under 28 U.S.C. Section 2254* at 7), and his failure to have raised, as well, the second half of his second contention in this 28 U.S.C. § 2254 action (that his attorney was constitutionally ineffective in having "failed to discover Morris shot a gun resulting in [Petitioner's?] failure to raise the issue of self-defense" (Petitioner's *Application[] For Habeas Corpus Under 28 U.S.C. Section 2254* at 7). Accordingly, because the United States Supreme Court has recently restricted a District Court's power to issue a "stay and abeyance" of a Petitioner's unexhausted claims (Rhines v. Weber, ___ U.S. ___, ____, 125 S.Ct. 1528, 1535 (2005)(the "limited circumstances" under which "stay and abeyance" of unexhausted claims is appropriate is where such claims are not "plainly meritless" and where there exists "good cause" for petitioner's failure to have exhausted such claims)), and because, under Rhode Island Supreme Court precedent, it would not appear that Petitioner could now bring to the Rhode Island Supreme Court's attention the two unexhausted ineffectiveness-of-counsel claims he has raised in this Petition,[4] the State would respectfully suggest that this Court

[4] In Wilkinson v. State Crime Laboratory Com'n, 788 A.2d 1129, 1131, n.1 (R.I. 2002), the State Supreme Court explained that issues not presented in the appellate briefs are deemed waived. *See also* R.I.G.L. § 10-9.1-8 ("All grounds for relief available to an applicant at the time he or she commences a proceeding under this [post-conviction relief] chapter must be raised in his or her original, or a supplemental or amended, application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief, may not be the basis for a

"allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims" (Rhines v. Weber, ___ U.S at ____, 125 S.Ct. at 1535) only.

Turning, now, to those unexhausted claims, the first (relating to the alleged preclusion of the defense counsel's cross-examination of a state's witness) was raised by Petitioner in his direct appeal of conviction, and rejected by the Rhode Island Supreme Court as follows:

> [D]efendant[] *** claim[s] *** that the trial justice erred in prohibiting the defense from pursuing its cross-examination of Strong on the issue of her bias and motive for testifying as she did. They posit that Strong was aware of a civil suit filed by Davis's mother pursuant to the Criminal Injuries Compensation Act, G.L.1956 chapter 25 of title 12(act). They offer or suggest to us, however, no evidence from the record that indicates or even permits the inference that Strong's testimonial denial of having any knowledge about her sister's civil suit was anything but truthful. At trial, defense counsel sought to cross-examine Strong in regard to whether she thought that a conviction was a necessary prerequisite for her sister to recover in that civil suit, ignoring, of course, Strong's earlier denial of having any knowledge of that civil suit. Although the language of § 12-25-3(f) clearly precludes the necessity of a conviction before recovery, the defendants at trial apparently believed that if they could show that Strong did know of her sister's civil suit and also that she believed that the defendants' convictions were a necessary prerequisite for recovery in that civil suit, those combined facts would then be a sufficient basis for causing Strong to be untruthful in her testimony. In refusing to allow such cross-examination, the trial justice noted that the act does not, by its terms, require any conviction. He explained further to defense counsel that he was going to terminate counsel's questioning of the witness about her sister's civil suit because the witness had answered, "[N]o, I don't know," in response to the defense counsel's question "[H]as she communicated to you what, if anything, she's going to do about this incident? * * * [W]hat she's going to do with--about this case?" We agree with the trial justice's ruling.

---

subsequent application, unless the court finds that in the interest of justice the applicant should be permitted to assert such ground for relief.").

"Effective cross-examination is an essential element of the presentation of a full and fair defense and is guaranteed by both the State and the Federal Constitutions." State v. Veluzat, 578 A.2d 93, 94 (R.I. 1990). Moreover, "the cross-examiner must be given a reasonable opportunity to explore and to establish any possible bias, prejudice, or ulterior motive that a witness may possess that might affect the witness' testimony." *Id.* at 94-95. Nevertheless, "the scope of cross-examination, even for the purpose of exposing bias [or motive], is not unlimited. Limiting the extent and scope of cross-examination is within the sound discretion of the trial justice, and any such ruling by a trial justice will be left undisturbed by this court absent a showing of clear abuse of that discretion." *Id.* at 95. Although some limitation of the extent and the scope of cross-examination is permissible, in order to ensure that the defense receives a fair trial, the trial justice must permit "reasonable latitude" on cross-examination, including "an opportunity for a defendant to establish or reveal possible bias, prejudice, or ulterior motives as they may relate to the case being tried." State v. Anthony, 422 A.2d 921, 924 (R.I. 1980). Such reasonable latitude was certainly provided to the defendants' counsel in this case.

The defendants here were clearly afforded full opportunity to inquire about whether Strong had any knowledge of her sister's civil action brought under the Criminal Injuries Compensation Act. Strong was specifically asked by defense counsel whether Strong's sister had "communicated to * * * [her] what, if anything, she's going to do about this incident? * * * [W]hat she's going to do with- -about this case?" Strong, however, had responded, "[N]o, I don't know." The trial justice's decision to terminate the inquiry concerning her sister's pending civil action at that point was proper. The trial justice did not abuse his discretion in limiting defense counsel from further cross-examining the witness Strong about a matter that she testified she had no knowledge of. No case law has been presented that supports such pointless continued cross-examination and we hesitate to create it in this case.

Defense counsel had certainly been given ample opportunity to explore for any signs of bias in the witness. If, notwithstanding, he believed that he had not adequately exhausted his opportunity to do so, he certainly could have indicated to the trial justice just what he was digging for but could not unearth. An offer of proof pursuant to Rule 26(b) of the Superior Court Rules of Criminal Procedure was available to him. Instead, however, defense counsel simply informed the trial justice that the court could not "require" him to make an offer of proof on cross-examination pursuant to State v. DeBarros, 441 A.2d 549 (R.I. 1982), thus effectively refusing to assist the trial justice by making an offer of proof. We acknowledge defense counsel's reliance upon DeBarros, and its

clear support for counsel's refusal. Rule 26(b), which had been adopted some ten years earlier, [footnote deleted] is not opposite DeBarros. Rule 26(b) *permits* offers of proof, but does not mandate such offers. In this case, however, the trial justice obviously believed that defense counsel had been given adequate opportunity to cross-examine on the possible bias of the witness. Had an offer of proof been made, we would now certainly be in a better position to determine therefrom whether the trial justice had abused his trial-control discretion in terminating defense counsel's further questioning on that issue. If the trial justice was unable to see the need for any further cross-examination on the bias issue, we on review are less able to do so in the absence of an offer of proof from counsel or some indication in or from the record of where the continuing questioning might eventually have led. If that direction had been indicated, the trial justice might then have been alerted to information not otherwise available to him and he might very well have then permitted defense counsel to continue his inquiry. If counsel did not want to expose his intended area of further cross-examination to the ears of the witness, he certainly could have requested a sidebar conference, out of the hearing of the witness, where a record of his offer of proof could have been made and preserved for later review. [Footnote omitted.] *** Absent that offer of proof, or some indication on the record of what counsel believed that he could unearth, we are unable to perceive any abuse of discretion in the trial justice's ruling. ***

Absent that offer of proof or some indication from counsel on the record in regard to what might have developed from his continued questioning of the witness Strong, there appears to have been no evidence before the trial justice from which he might have concluded that continued questioning by defense counsel or a "voir dire" of the witness would have produced any additional probative evidence from her that would have been of any assistance to the defendants.

As was aptly put by Justice Kelleher, "a fishing expedition on cross-examination may properly be brought to a halt when it becomes obvious that the pond is devoid of fish." State v. Brennan, 527 A.2d 654, 657 (R.I. 1987). When Strong answered defense counsel's inquiries in the negative, the pond was deemed empty and defense counsel had opportunity to then either tell the court where he believed the fish were hiding or to pack up his fishing gear and try elsewhere. Defense counsel, however, elected not to inform the trial justice whether he believed there were any fish in the pond. Accordingly, there was no abuse of discretion in the trial justice's ruling limiting the cross-examination of Strong about what she might have believed regarding the sister's civil action, of which the

> witness testified she was unaware. The defendants' claim of error is without merit.

(State v. Doctor, 690 A.2d at 326-328.)(emphasis in original)

In determining the propriety of this determination, it is necessary to reference 28 U.S.C. § 2254(d)(1), which, in relevant part, provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim *** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ***.

Regarding this provision, the United States Court of Appeals for the First Circuit has recently taught that:

> The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result," *id.* at 406, 120 S.Ct. 1495. The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. Moreover, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495.

(Smiley v. Maloney, 422 F.3d 17, 20 (2005).)

Applying these teachings to the Rhode Island Supreme Court's determination that Petitioner's Sixth Amendment Rights were not violated by the trial justice's preclusion of further inquiry of Ms. Strong as to her knowledge of whether her sister (the victim's

mother) had or was making a claim under the State's victim-compensation-act, it can in no way be said that the Rhode Island Supreme Court's careful and lengthy determination on this point was not only erroneous or incorrect, but *unreasonably* so. Similar to the Rhode Island Supreme Court's discussion of the Sixth Amendment issue, the United States Court of Appeals for the First Circuit has recently reaffirmed that:

> In the last analysis, *** the right to cross-examination is not unbridled. So long as the trial court affords the defendant a fair opportunity for effective cross-examination, it may impose reasonable restrictions based on concerns such as undue prejudice, confusion of the issues, witness badgering, redundancy, *or questioning that appears to be of marginal relevance*. Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The trial court's latitude in shaping such restrictions is "wide." Id.

(United States v. Vega Molina, 407 F.3d 511, 523 (2005).)(emphasis added)

Because, as explained by the Rhode Island Supreme Court, the fact that *Lena Davis* had filed a claim under the Act was all but irrelevant to *Ms. Strong's* motive to testify (especially since conviction was not even a pre-requisite to a claim under the act), and because defense counsel was undoubtedly given wide latitude in his cross-examination of Ms. Strong, the Rhode Island Supreme Court's determination of this issue was not plainly erroneous, let alone unreasonably so.

As well, the Rhode Island Supreme Court's determination – in the course of its opinion denying Doctor's appeal of the Superior Court's denial of his post-conviction relief application – that Doctor's trial counsel was not constitutionally ineffective in failing to "pursue a line of questioning" (Doctor v. State, 865 A.2d at 1069), can also in no way be characterized as unreasonably erroneous. The Rhode Island Supreme Court rejected Doctor's claim that "his [trial] counsel was ineffective because he did not pursue

a line of questioning regarding a discrepancy between the testimony at the juvenile Lewis' family Court proceedings and the testimony at Doctor's trial" as follows:

> In the Family Court proceeding, testimony was proffered that only four individuals were in the car during the shooting. *See* In re Douglas L., 625 A.2d at 1357, 1358 (R.I.1993). At Doctor's trial, however, the testimony revealed that six people were in the car. *See* Doctor, 690 A.2d at 323. Doctor offers no argument why a line of questioning on this point would change the verdict at a new trial. In fact, the juvenile Lewis, Doctor's accomplice, was convicted of assault with intent to murder after a trial in the Family Court with the testimony that there were only four passengers in the car. *See* In re Douglas L., 625 A.2d at 1358. In our opinion, any questioning advanced by counsel concerning the number of people in the car would make no difference in the outcome of a new trial.
>
> Moreover, Doctor has failed to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Brown, 534 A.2d at 182 (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). Defense counsel's decision not to raise a line of questioning concerning the number of people in the car clearly "fell within that acceptable range of latitude afforded defense counsel to determine trial strategy and therefore was not unreasonable." *Id.* at 183. *See also* Toole, 748 A.2d at 809-10 (failure to call certain witnesses and to object at certain points during a trial was not constitutionally unreasonable); Hughes v. State, 656 A.2d 971, 972-73 (R.I.1995) (failure to argue against admissibility of evidence and challenge jury instructions was not unreasonable); Brown, 534 A.2d at 183 (failure to admit certain evidence was not unreasonable); State v. D'Alo, 477 A.2d 89, 91-93 (R.I.1984) (failure to object to certain testimony, counsel making improper statements to the trial justice resulting in mild admonishment in front of jury, and failure to brief certain issues on appeal was not ineffective assistance of counsel).

(Doctor v. State, 865 A.2d at 1069.)

Respectfully, the State would suggest that this ineffectiveness determination is by no means erroneous, let alone unreasonably so.

The same can be said of Petitioner's next and last-exhausted ineffectiveness contention, relating to the trial justice's custody jury-instruction and which the Rhode

Island Supreme Court, in Doctor v. State, 865 A.2d at 1067-69, examined and determined in the following way:

> First he contends that his counsel, a highly respected veteran in the Public Defender's Office, failed to discuss a proposed Fenner instruction[5] with him and failed to object to the instruction when it was given.[6] He specifically alleges that his "counsel did not

---

[5] In a footnote, the Court stated that:

> In State v. Fenner, 503 A.2d 518, 522 (R.I.1986), we held that:
>
> "it should be the obligation of a trial justice to inform counsel in advance if he or she intends to advise prospective jurors or jurors who have been selected to serve on a particular case that the defendant is in custody for the purpose of neutralizing any inference that might otherwise be formed. In the event that counsel objects to such an admonition, he or she has an obligation to inform the trial justice forthwith before the admonitions have been given. In such a situation, the trial justice should forego making such a statement to the jurors, but the defendant assumes the risk that by some inadvertence he or she may be seen in the course of being transported from the ACI to the courthouse or otherwise be seen to be in custody in circumstances of which the court might not be aware and in circumstances where this observation might not be called to the attention of either the court or counsel."

[6] In a footnote, the Court set forth that:

> The trial justice instructed the jury in the January 1995 trial as follows:
>
> "Furthermore, you will note the fact there are marshals in the courtroom. I simply would advise you that the defendants are in custody for lack of bail. That is not at all germane, nor is it important to the jury's task in considering guilt or innocence in this case. In no way does their detention for lack of bail diminish the presumption of innocence which surrounds each of them. The mere fact that they have been detained for lack of bail must not prejudice you against them at all, nor should their detention generate any sympathy for them, either. The fact of the matter is you should

discuss with him and failed to object to the trial justice instructing the jury at the beginning of the trial that he was in custody for lack of bail." ***

In reviewing a claim for ineffective assistance of counsel, we have adopted the standards set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 *** (1984). *See* Armenakes v. State, 821 A.2d 239, 245 (R.I.2003); Brennan v. Vose, 764 A.2d 168, 171 (R.I.2001); La Chappelle, 686 A.2d at 926; Brown v. Moran, 534 A.2d 180, 182 (R.I.1987). Under Strickland, a two-part test must be satisfied: (1) the court "must be persuaded that counsel's performance was deficient[,]" and (2) "that the deficient performance prejudiced that defendant to such a degree that he was deprived of effective assistance of counsel." State v. Figueroa, 639 A.2d 495, 500 (R.I.1994) (citing Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052). Under the first part "[i]n reviewing a claim for ineffective assistance of counsel, [this Court has] stated that the benchmark issue is whether 'counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" Toole v. State, 748 A.2d 806, 809 (R.I.2000) (quoting Tarvis v. Moran, 551 A.2d 699, 700 (R.I.1988)). *See also* Carpenter v. State, 796 A.2d 1071, 1073-74 (R.I.2002). Furthermore, "[a] strong presumption in favor of competent representation exists." Figueroa, 639 A.2d at 500 (citing Strickland, 466 U.S. at 689-90, 104 S.Ct. 2052). Under the second part of the test, "[p]rejudice exists if there is a reasonable probability that, absent counsel's deficient performance, the result of the proceeding would have been different." *Id.* (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052).

At the outset it is important to note that while it is not certain whether the trial justice conferred with counsel concerning the Fenner instruction, or whether counsel conferred with Doctor about the instruction, the weight of the credible evidence presented suggests that both occurred. Counsel for both Alexis and Jose Doctor testified at the hearing. [Footnote: At the January 1995 trial, attorney James Ruggerio represented Jose Doctor. He was called as a witness by Alexis Doctor at the postconviction-relief hearing.] Neither could remember this particular case with specificity, but they both testified that it was their normal practice to confer with their clients concerning Fenner instructions, and that they would have objected to the instruction if asked to do so by their respective

---

disregard that detention, to the extent you regard it at all, as simply a neutral fact and give it no weight whatsoever."

> clients. The hearing justice, who also was the trial justice, also stated that it was his normal practice to consult with counsel before delivering a Fenner instruction to the jury and noted that he could "not remember ever gratuitously offering such an instruction without notifying counsel that [he] intended to do so." The only evidence to the contrary was Doctor's own assertions that neither the trial justice nor his own counsel conferred with him about the Fenner instruction.[[7]]
>
> Furthermore, even if counsel neglected to confer with Doctor regarding the Fenner instruction, we agree with the hearing justice's determination that Doctor was not prejudiced by the Fenner instruction that was given to the jury at the January 1995 trial. The courtroom was small and crowded and several marshals were present in the room, some in very close proximity to defendants. It is highly likely that the jury knew that the two defendants were in custody, and it should have been no surprise to the jurors when the trial justice so informed them. In our opinion, counsel's objection to the instruction being given would not have changed the outcome in this case.

(Doctor v. State, 865 A.2d at 1067-69.

With respect to this reasoned and persuasive determination, the State would respectfully suggest that the Rhode Island Supreme Court did not decide the issue in such a way as to be "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

**Conclusion**

For the foregoing reasons, the State respectfully requests that petitioner's habeas petition be denied and dismissed on all counts with prejudice.

[7] The Court at this point stated in a footnote that "The hearing justice noted that Doctor's contentions on this point were not credible. We previously have held that in reviewing an application for postconviction relief, we defer to the trial justice's findings on credibility unless clearly wrong. Usenia v. Vose, 685 A2d 1066, 1067 (R.I. 1996) (citing Fontaine v. State, 602 A.2d 521, 525-26 (R.I. 1992))."

Respectfully submitted,

**STATE OF RHODE ISLAND**
By its attorneys,

**PATRICK C. LYNCH**
**ATTORNEY GENERAL**

**AARON L. WEISMAN # 4438**
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400

**CERTIFICATION**

I hereby certify that on the 1st day of November, 2005, I placed a copy of the within document in the U.S. mail, postage prepaid, to Alexis Doctor, pro-se, at his last known address of PO Box 8272, Cranston, Rhode Island, 02920.